70        THE CHIC., R. I. & P. R. R. Co. *v.* RILEY. [Sept. T.

Opinion of the Court.

THE CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY

*v.*

SILVANIAN RILEY.

EXCESSIVE DAMAGES — *expulsion of passenger from cars.* In trespass against a railway company for ejecting the plaintiff from a passenger coach near a station, where no extreme violence was used, and no maliciousness or wanton recklessness was manifested, and the plaintiff was not seriously and permanently injured, it was held that $2,500 damages were excessive and a new trial was awarded.

APPEAL from the Circuit Court of La Salle county; the Hon. EDWIN S. LELAND, Judge, presiding.

This was an action of trespass, by the appellee against the appellant, brought in the circuit court of Bureau county, and taken by change of venue to La Salle county. The material facts of the case are fully stated in the opinion of the court.

Mr. G. S. ELDRIDGE, and Mr. THOMAS F. WITHROW, for the appellant.

Mr. J. I. TAYLOR, for the appellee.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This action was prosecuted to recover for injuries received by the plaintiff in consequence of being violently ejected from a passenger car on the defendant's road, by its servants, at or near a station called Mineral, in Bureau county.

The verdict of the jury was for the plaintiff, assessing his damages at $2,500, upon which the court gave judgment.

The plaintiff entered the car, which was one of a regular passenger train on the defendant's road, at Mineral, intending to go to Burlington Crossing, and thence by the C. B. & Q. R. R. to Princeton, where he had been subpœnaed to attend as a witness in a case to be tried on that day. He was accompanied

by several others, on a like errand, among whom was Kepler, who sat in the same seat in the car with him, on the side next the aisle which extends between the rows of seats. The fare charged by the defendant for passengers from Mineral to Burlington Crossing was fifty cents; but at $2\frac{1}{2}$ cents per mile, which was claimed by Kepler and others of the party to be "legal fare," it would have been only thirty-five cents. Soon after the train started from Mineral, the conductor came to the seat in which were the plaintiff and Kepler, collecting fare. Kepler handed him thirty-five cents, after informing him where he was going. This the conductor returned to him, telling him he must either pay fifty cents or leave the car. Upon his refusing to comply, the train was checked, run back some distance toward the station and he was removed.

There is a conflict in the evidence as to what occurred between the plaintiff and conductor in regard to his fare. He says the conductor did not demand his fare, but, after having removed Kepler, ordered him to be seized and removed, although he notified him he was willing to pay the regular fare; while the conductor and several other witnesses say he expressly refused to pay more than what he called "legal fare," thirty-five cents. Inasmuch, however, as the case must go before another jury for error unconnected with this question, we deem it inexpedient to comment on the evidence in this respect.

A fair and dispassionate consideration of all the evidence, to our minds, relieves the conduct of the defendant's servants from the charge of that degree of wanton recklessness or maliciousness which is essential to justify so large a verdict, unless it has been proved, as the plaintiff claims it has, that he was seriously and permanently injured.

The injuries plaintiff claims to have received of this character, were, what the medical witnesses call "painful crepitation," on the right side near the lower angle of the right shoulder blade; and "hepatization" of the middle lobe of the right

lung, caused, as is argued, by being forced against the door, or the side of the door, as he was put out of the car.

The evidence of the medical witnesses, considered with reference to apparent intelligence, experience and skill in the profession, as well as to numbers, in our opinion, clearly and decidedly preponderates that a blow of sufficient violence to cause "hepatization" of the lungs would be immediately followed by prostration, chill, and fever; that the first effect upon the lungs would be inflammation, after which would follow the "hepatization;" that although "crepitation" of the muscles may be produced by a violent blow, it may also be the result of rheumatism, or of other causes.

The plaintiff says, after he was put out of the car he immediately returned, entering at the opposite end. He seems to have engaged with much warmth in a verbal altercation with the conductor, which was kept up until he left the train at the Burlington Crossing, and until that time he makes no complaint of having suffered physical pain in consequence of his expulsion; then, however, he says he "felt considerable sore from the effects of it." When he reached Princeton he did not feel under the necessity of calling upon a physician until after he had visited his attorney. He says: "It runs in my mind I went to Lawyer Taylor's office before I went to Latimer's. I am pretty sure I did. I think Taylor told me I ought to have something done for it."

When he consulted Latimer, he says Latimer gave him a liniment and advised him to put on a blister. He was at the hotel, but feeling pain, and thinking he would rest better in a private house, went home with a friend residing in Princeton, and staid all night with him. This friend says, when the plaintiff retired for the night he requested him to rub some of the liniment on his back. He examined his back, and discovered that "a little along the lower point of the right shoulder blade seemed to be a little red and swollen, and he rubbed the liniment on it," upon which plaintiff made complaint that the

pressure gave him pain. The next morning the plaintiff got up, ate his breakfast and departed.

In addition to being at his lawyer's office, the physician's office and the hotel, after he arrived at Princeton, he was at the court house; and, in the evening, he was sitting in company with others, who were talking, at the hotel, until about nine o'clock, when he went home with his friend, and after reaching his house he sat talking with him and family about matters at Mineral some little time before going to bed. From this it is apparent he exhibited none of that evidence of recent severe violence which the medical evidence shows would have been manifested had the blow or jam he received been sufficient to have produced the consequences which he seeks to attribute to it. The grating noise or "crepitation," he says, he first observed two or three months after he was put out of the car.

No witness sustains him, so far as we have been able to ascertain from the evidence, in the fact that he was violently pushed or pulled against the door or the side of the door, and he does not claim that he was otherwise seriously or permanently injured by the expulsion.

His evidence on this point, as found in the abstract, is this: "They both had hold of me, and rushed me right into the aisle, and got about to the door, with my back against the door like. The door, or the side of the door like, struck at my shoulder. I was ahead, my face partly turned round south; my feet were kind of sideways. The men were angry, I think. They went about as fast as they could do it, I thought. The big man had hold of my right arm. They jammed me, I think, against the door or the side of the door, I can't say which it was, but my shoulder struck against something, either the side of the door or the door, and with that I went right off the top step, about ten feet, I should judge, down the grade."

Wheeler, the conductor, Kintz, the baggage-master, Alexander, road-master on the eastern end of the road, Bernett, road-master on the western end of the road, and O'Brien, who was attending to waterworks on the road, all swear that he was put

10—74th Ill.

out by Kintz, the baggage-master, alone, and that Kintz used no violence. Kintz positively denies that plaintiff struck against the door, and the others say they were in a position if he had struck the door to have observed it, but they saw nothing of the kind, and they all describe him as going out face-foremost.

Buswell, who was a passenger on the train, and lived in the same county, at no very great distance from Mineral, says, he can't say that Wheeler, the conductor, took hold of plaintiff; he thinks Kintz is the man who put him off. He uses this language : " I don't think Riley (the plaintiff) resisted particularly ; I am certain he didn't as far as I could see ; there was quite a little movement there ; I didn't see him jammed at all ; if there had been a tussle between them I could not have failed to have seen it, but I saw him go out just as you might take any man out that offered no resistance."

McCulloch, a witness for plaintiff, who is a farmer residing at Albion, in Henry county, was a passenger on the train, and says, he saw the plaintiff put off. He says, in cross-examination : " The man took hold of Riley (the plaintiff) by the collar; Riley made no resistance; he walked right along ; he was turned round at the door ; I might be mistaken as to this ; I did not see any violence—no harsh means, but to take him along, turn him around, and put him out."

Thompson, another witness for plaintiff, in his cross-examination, says he saw Wheeler have hold of plaintiff. " Don't know whether Kintz or Wheeler took hold first; there was not much difference ; plaintiff was facing north-east ; he was on the south side of the car; Wheeler went in behind plaintiff ; Kintz took hold of him by the arm in front; I am not mistaken that Wheeler had hold of him ; Kintz took hold of him by the arms and led him out; he did not jerk him out very viciously ; * * * I can't swear Riley (plaintiff) was jammed against the door; he went off, face foremost."

Williams, also a witness for the plaintiff, who claims to have been an eye-witness to the entire scene, says, he does not think

there was any thing very violent about the manner of getting the plaintiff out of the slip, and that he did not notice that plaintiff came in contact with any thing at the door.

That plaintiff was complaining of being unwell with cold and rheumatism in the morning before getting on the train is not contested.    That was given as a reason why he did not propose to go with the others, getting on at Mineral, at that time on "legal fare."

Brainerd, who professes to be an intimate friend of his, and who was one of his witnesses, furnished the exact change at his store, so they all could pay on the train.    He says, he asked plaintiff if he was going on "legal fare?"    He said, no, he was unwell; "I remember he had been complaining for a week before."

Other witnesses on behalf of the plaintiff also testify to his being unwell, and complaining of having rheumatism.    Witnesses, introduced on behalf of defendant, testify to hearing him complain of ill health, and especially of rheumatism, for a considerable period before this occurrence.    The plaintiff himself also admits to having been slightly troubled wilh rheumatism since his return from California, which we infer to have been a few years previous to his receipt of the injury in question. He says: "When I had a bad cold I would feel bad; it makes me feel unwell, and stiffens me up; I couldn't tell how many attacks I had had before this occasion; it may be more than one; that morning I felt stiff in the joints, not more in the shoulder than in the legs; I did not feel well for some days before; did not consult a physician," etc.

We have endeavored to give a careful consideration to all the evidence, and we feel convinced injustice is done the defendant, though no doubt unintentionally, by this verdict.    It is thereby made responsible for disease and suffering, resulting from causes with which, unless we have unwittingly overlooked important countervailing evidence, its servants have had no connection.

For the reason that, in our opinion, the damages assessed by the verdict are excessive, the judgment is reversed and the cause remanded.

*Judgment reversed.*